United States District Court
Southern District of Texas
**ENTERED**
January 22, 2016
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JESSE LOPEZ, JR.,                          §
                                           §
     Petitioner,                        §
                                           §
V.                                         §    CIVIL ACTION NO. H-14-3581
                                           §
WILLIAM STEPHENS, DIRECTOR, TEXAS §
DEPARTMENT OF CRIMINAL                     §
JUSTICE, CORRECTIONAL                      §
INSTITUTIONS  DIVISION,                    §
                                           §
     Respondent.                        §

## MEMORANDUM AND RECOMMENDATION GRANTING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT

Before the Magistrate Judge in this proceeding brought pursuant to 28 U.S.C. § 2254 is Respondent's Motion for Summary Judgment (Document No. 20) against Petitioner's Federal Application for Writ of Habeas Corpus (Document No. 1).  Having considered the motion, Petitioner's response in opposition (Document No. 28), the claims raised by Petitioner in his § 2254 Application and Memorandum of Law in support, the state court records, and the applicable law, the Magistrate Judge RECOMMENDS, for the reasons set forth below, that Respondent's Motion for Summary Judgment (Document No. 20) be GRANTED, that Petitioner's Federal Application for Writ of Habeas Corpus (Document No. 1) be DENIED, and that this case be DISMISSED WITH PREJUDICE on the merits.

## I.    Introduction and Procedural History

Jesse Lopez, Jr. ("Lopez") is currently incarcerated in Texas Department of Criminal Justice, Correctional Institutions Division (TDCJ-CID), as a result of a 2006 capital murder conviction, for

which he was sentenced to life imprisonment.  In an Indictment filed on August 31, 2005, Lopez was

charged, as follows, with the murders of Modesta Pena and Rudy Villanueva:

> JESSE LOPEZ, JR., hereafter styled the Defendant, heretofore on or about APRIL 2, 2005, did then and there unlawfully, during the same criminal transaction, intentionally and knowingly cause the death of MODESTA PENA, ALSO KNOWN AS THERESA PENA, by shooting MODESTA PENA, ALSO KNOWN AS THERESA PENA, with a deadly weapon, to wit: a firearm, and intentionally and knowingly cause the death of RUDY VILLANUEVA by shooting RUDY VILLANUEVA with a deadly weapon, to wit: a firearm.

(Document No. 12-4 at 10).  Lopez pled not guilty and proceeded to trial.  On November 17, 2006,

a jury found Lopez guilty of capital murder, and because the State had not sought the death penalty,

he was sentenced to life imprisonment.  His conviction was affirmed by Texas' First Court of

Appeals in a fifty page unpublished opinion on May 1, 2008, and his petition for discretionary review

was refused on October 1, 2008.   He did not file a petition for writ of certiorari.

On or about November 13, 2009, Lopez filed a state application for writ of habeas corpus.

It was denied by the Texas Court of Criminal Appeals without written order on November 26, 2014.

This § 2254 proceeding, filed on December 12, 2014,  followed.

Respondent has filed a Motion for Summary Judgment (Document No. 20), to which Lopez

has filed a response in opposition (Document No. 28).  This § 2254 proceeding is ripe for ruling.


**II.    Factual and Evidentiary Background**

The factual and evidentiary background, as set forth by Texas' First Court of Appeals in

affirming Lopez' conviction, is as follows:

> Appellant, Jesse Lopez, was convicted for the murder of the complainants following an altercation outside Poppa Burger, a small 24-hour Houston roadside restaurant with outdoor picnic table seating.  The incident began in the midnight hours of Saturday, April 2, 2005, when four couples arrived at the restaurant to order

2

food.  The group drove to Poppa Burger in two cars following an evening of drinking beer and other alcohol.  The following individuals arrived at Poppa Burger: (1) appellant [Lopez]; (2) appellant's common-law wife, Erica Diaz ("Erica"); (3) appellant's uncle Jimmy Lopez ("Jimmy"); (4) Jimmy's common-law wife Guadalupe Cardenas; (5) Anthony Hinojosa ("Anthony"); (6) Lisa Hinojosa ("Lisa"); (7) appellant's step-sister Alexandria Stone ("Alex"); (8) Alex's husband Hugo Sanchez ("Hugo").

Two Poppa Burger employees, Martha Sisco and Yamileth Reyes, were working when they saw the cars park next to a vacant warehouse near the restaurant. Both testified that they noticed the group because of the loud music coming from their cars.  As appellant [Lopez] walked up the ramp to the ordering line, his shirt lifted and Sisco saw a gun in his waistband.  Sisco testified that the gun made her nervous.

Six members of the group, including appellant [Lopez], ordered food and ate it at a  picnic table near the ordering window.  The two other individuals, Alex and Hugo, remained in a car.  As the group ate their meal, regular customers Rudy Villanueva and Modesta Pena ("the complainants") rode up on their bicycles and parked.  Villanueva began walking up the ramp to order food from the attendant at the widow.  Before Villanueva could reach the window, Jimmy knocked both complainant's bikes over on the way to the bathroom.  Jimmy apologized, picked up the bikes, and continued around the restaurant's exterior to use the restroom.

Before the altercation started that led to the shooting, the facts are generally agreed upon.  However, what happened between this point and the deaths of the complainants, as well as the reasons for the shootings, were in dispute at appellant's [Lopez'] trial.  We present both versions.

### A.    State's Evidence

Villanueva was upset that the bikes had been knocked over and began mumbling and cursing.  At some point, appellant [Lopez] left his table and confronted Villanueva.  Scared, Sisco left her work station and went to go hide in the restaurant's walk-in freezer.

Reyes testified that she saw appellant [Lopez] push Villanueva and that a fist-fight ensued. Lisa and Jimmy both testified that Villanueva was the first aggressor. Anthony joined the fray on appellant's [Lopez'] behalf.  Pena tried to approach the fight in order to defend Villanueva and separate the combatants, but the women in appellant's [Lopez'] group stopped her.  Three of the women hit Pena, pulled her hair, threw a drink on her, and kicked her until she fell to the ground with the women on top of her.  All three women were quite a bit larger than Pena.

3

While the women were hitting Pena, appellant [Lopez] was on top of and fighting Villanueva with Anthony's help. Jimmy heard the struggle from behind the building. returned to the area, and punched Villanueva in the face, causing Villanueva to fall to the ground. At that point, Anthony moved away from Villanueva, while Jimmy positioned himself between appellant [Lopez] and Villanueva. Jimmy then told Villanueva that they did not want any problems. Appellant [Lopez] leaned around Jimmy and shot Villanueva eight times with his 9-millimeter handgun while Villanueva was prostrate on the ground.

The women fighting Pena heard the gunshots and all but Erica got off Pena and fled to their vehicles. Jimmy and Anthony returned to the vehicles as well. Appellant [Lopez] walked over, pulled Erica off Pena, and pointed the gun at Pena as she lay on the ground. The medical testimony revealed that Pena was injured, curled up in a defensive position, and trying to scoot back away from appellant [Lopez] when she was shot. Lisa testified that appellant [Lopez] fired his remaining eight bullets into her as he walked to his vehicle. Appellant [Lopez] and his friends then drove away.

Officers found Pena dead at the scene with some money and a disposable lighter still in her hand. A bicycle chain and lock was lying next to her body. Villanueva was found alive and was transported to the hospital by EMS, where he later died. At the scene of the incident, officers recovered 16 fired 9-millimeter cartridge casings from the area where the victims were shot, along with a cellular phone.

Autopsies confirmed that Villanueva and Pena were each shot eight times and died from their injuries. Each also suffered significant head trauma. A firearms examiner confirmed that two bullets taken from Villanueva's body, two bullets taken from Pena's body, and the 16 fired 9-millimeter cartridge casings found near the shooting site were all fired or ejected from the same gun.

Shortly after the shooting, appellant [Lopez] told Jimmy that he killed Pena because he did not want to leave a witness. He also said that he dropped his cell phone at the restaurant. Appellant [Lopez] devised a plan to have his mother report the cell phone stolen, however, officers eventually recovered the cell phone and established appellant's [Lopez'] ownership by utilizing the phone numbers stored on the phone. As a result, officers were able to present Sisco and Reyes with photospreads containing appellants [Lopez'] picture in order to determine whether either or both Poppa Burger employees could place appellant [Lopez] at the scene of the shooting.

Reyes positively identified appellant [Lopez] as the man with a gun at Poppa Burger the night of the shooting, while Sisco said appellant [Lopez] looked like the man. At trial, both Reyes and Sisco positively identified appellant [Lopez] as the

man with the gun at Poppa Burger the night of the murders.  Both Lisa and Jimmy unequivocally identified appellant [Lopez] as the shooter.

### B.    Appellant's [Lopez'] Evidence

Appellant [Lopez] testified that Villanueva was intoxicated, angry and cursing him and Jimmy after Jimmy knocked over Villanueva's bike.  Jimmy apologized, after which Villanueva walked up and hit appellant [Lopez] in the face.  The blow knocked appellant [Lopez] to the ground and Villanueva landed on top of him.  Pena, who appellant [Lopez] testified also seemed intoxicated, ran over and also started hitting appellant [Lopez].

During the struggle, Villanueva started grabbing for appellant's [Lopez'] gun and both men fought over it.  The gun went off one time.  Jimmy separated the men and appellant [Lopez] retained control of the gun.  Appellant [Lopez] testified that just after they were separated and the confrontation ended, appellant [Lopez] shot Villanueva because he felt scared of him and thought he had no other choice.

Appellant [Lopez] stated that after shooting Villanueva, he saw Pena hitting Erica with the bike chain and ran over to intervene.  Erica managed to get the chain away from Pena, and she fell backwards.  Erica then ran away to the vehicle.  As appellant [Lopez] drew near, Pena reached up and grabbed appellant's [Lopez'] arm.  Appellant [Lopez] yanked his arm away and Pena fell backwards again.  Appellant [Lopez] then started shooting his gun at Pena as he ran to the vehicle.

*Lopez v. State*, No. 01-06-01079-CR at 3-7.


### III.    Claims

Lopez alleges in this § 2254 proceeding, as he did in the state habeas proceeding, that his trial

counsel, James Stafford, was ineffective for:

1.    failing to object to a suggestive in-court identification made by two State witnesses;

2.    failing to object to Officer Duncan's speculative and unsupported expert opinion that the chain and lock used by one of the complainants during the altercation that resulted in the deaths of the two complainants could not generally be considered a "deadly weapon";

3.    failing to object to the trial court's exclusion of the complainant's toxicology reports, and failing to make an appropriate record for purposes of preserving

that issue for appeal;

4.      failing to retain an expert to support the defense's self-defense theory and rebut the opinions of the State's expert on the issue of self-defense; and

5.      failing to object to the trial court's exclusion of evidence about complainant Villanueva's appearance and his "tear-drop" tattoo, and failing to make an appropriate record for purposes of preserving the issue for appeal.

Lopez also alleges, as he did in the state habeas proceeding, that his due process rights were violated by comments made by the prosecutor during closing arguments.

In the Motion for Summary Judgment, Respondent argues that no relief is available on any of these claims under 28 U.S.C. § 2254(d) because the state courts' adjudication of the claims is not contrary to, or based on an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence.  Lopez, in response (Document No. 28) maintains that § 2254(d) should not be applied to review his claims, and that a *de novo* review should be available to him because he was only afforded a "paper hearing" in the state habeas proceeding, and because the state trial court judge who presided over his trial (Mike Anderson) passed away during the pendency of his habeas proceeding.

## IV.     Standard of Review – Merits Review under § 2254(d)

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), when a claim presented in a federal habeas corpus proceeding has already been adjudicated on the merits in a state proceeding, federal review is limited.  28 U.S.C. § 2254(d) provides:

(d)  An application for writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

"For purposes of 28 U.S.C. § 2254(d)(1), clearly established law as determined by [the Supreme] Court 'refers to the holdings, as opposed to the dicta, of th[e] Court's decisions as of the time of the relevant state-court decision.'" *Yarborough v. Alvarado*, 541 U.S. 652, 660-61 (2004) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

"[A] decision by a state court is 'contrary to' [the United States Supreme Court's] clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court] cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [its] precedent.'" *Price v. Vincent*, 538 U.S. 634, 640 (2003) (quoting *Williams*, 529 U.S. at 405-406).  A state court decision involves an "unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from the Supreme Court's decision but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413.  "State-court decisions are measured against [the Supreme Court's] precedents as of 'the time the state court renders its decision.'" *Cullen v. Pinholster*, 563 U.S. 170, 131 S.Ct. 1388, 1399 (2011) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003)).  Similarly, state court decisions are reviewed under § 2254(d) by reference to the facts that were before the state court at the time.  *Id.* ("It would be strange to ask federal courts to analyze whether a state court adjudication resulted in a decision that unreasonably applied federal law to facts not before the state court.").

For factual issues, "the AEDPA precludes federal habeas relief unless the state court's decision on the merits was 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" 28 U.S.C. § 2254(d)(2) (2000). "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 130 S.Ct. 841, 849 (2010). Instead, factual determinations made by state courts carry a presumption of correctness and federal courts on habeas review are bound by them unless there is clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1) (2000). *Smith v. Cockrell*, 311 F.3d 661, 667 (5th Cir. 2002), *cert. dism'd,* 541 U.S. 913 (2004).

Under § 2254(d), once a federal constitutional claim has been adjudicated by a state court, a federal court cannot conduct an independent review of that claim in a federal habeas corpus proceeding. *Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. 770, 786-787 (2011). Rather, it is for the federal court only to determine whether the state court's decision was contrary to or involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States, and whether the state court's decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Woodford*, 537 U.S. at 27 ("The federal habeas scheme leaves primary responsibility with the state courts for these judgments and authorizes federal-court intervention only when a state-court decision is objectively unreasonable."). This is true regardless of whether the state court rejected the claims summarily, or with a reasoned analysis. *Cullen*, 131 S.Ct. at 1402 ("Section 2254(d) applies even where there has been a summary denial."). Where a claim has been adjudicated on the merits by the state courts, relief is available under § 2254(d) *only* in those situations "where there is no possibility fairminded

jurists could disagree that the state court's decision conflicts with" Supreme Court precedent. *Richter*, 131 S.Ct. at 786.

Whether a federal habeas court would have, or could have, reached a conclusion contrary to that reached by the state court on an issue is not determinative under § 2254(d).  *Id.* ("even a strong case for relief does not mean that the state court's contrary conclusion was unreasonable.").  In addition, the correctness of the state court's decision is not determinative.  As instructed by the Supreme Court in *Wiggins v. Smith*, 539 U.S. 510, 520 (2003), "[i]n order for a federal court to find a state court's application of our precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. . . . The state court's application must have been 'objectively unreasonable.'" (citations omitted); *see also Price*, 538 U.S. at 641 ( "'[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state court decision applied [a Supreme Court case] incorrectly.  Rather, it is the habeas applicant's burden to show that the state court applied [that case] to the facts of his case in an objectively unreasonable manner.'") (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002)).  Moreover, it is the state court's ultimate decision that is to be reviewed for reasonableness, not its reasoning.  *Neal v. Puckett*, 286 F.3d 230, 244-46 (5th Cir. 2002), *cert. denied*, 537 U.S. 1104 (2003); *Pondexter v. Dretke*, 346 F.3d 142, 148-9 (5th Cir. 2003), *cert. denied*, 541 U.S. 1045 (2004).  A habeas petitioner can only overcome § 2254(d)'s bar "by showing that 'there was no reasonable basis'" for the state court's rejection of his claim(s).  *Cullen*, 131 S.Ct. at 1402 (quoting *Richter*, 131 S.Ct. at 784)).

**V.**     <u>**Discussion**</u> **- Ineffective Assistance of Counsel Claims**

In five claims, Lopez complains about the performance of his counsel, James Stafford, at trial. In claim one, Lopez maintains that Stafford should have objected to and challenged both the in-court and out of court identification of him by two State witnesses – Martha Sisco and Yamileth Reyes.  According to Lopez, Martha Sisco's trial testimony suggests that the State "coached" or influenced her identification of him from a photospread and then "coached' or influenced her identification testimony at trial.  In claims two, three, four and five, Lopez complains about Stafford's performance and the adverse affect it had on his self-defense theory.  In particular, in claims three and five, Lopez maintains that Stafford should have objected to the trial court's rulings which excluded from evidence: (1) the toxicology reports on the two complainants, which showed that both complainants had multiple illegal drugs in their system at the time of the altercation and their deaths, and which Lopez claims could have shown, in furtherance of his self-defense theory and defense, that the complainants were dangerous, volatile and erratic; (2) autopsy photographs of complainant Villanueva which showed his multiple tattoos and his menacing appearance; and (3) Lopez' belief, in furtherance of his self-defense theory and defense, that complainant Villanueva's teardrop tattoo represented that he had previously killed someone.  In addition, in claims two and four, Lopez complains about Stafford not objecting to Officer Duncan's opinions that the chain and lock used by complainant Pena are not generally known as or considered to be a dangerous weapon, and Stafford's failure to retain an expert who could have provided expert opinion on the self defense theory, including the effect of narcotics on the complainants, the perceived meaning of a teardrop tattoo, and the possible use of a bike chain and lock as a deadly weapon.

Each of these ineffectiveness claims was raised by Lopez in his state application for writ of habeas corpus. As argued by Respondent in the Motion for Summary Judgment, no relief is available to Lopez on the merits of his ineffectiveness claims because the Texas Court of Criminal Appeals' rejection of those ineffectiveness claims is not contrary to clearly established Federal law as determined by the Supreme Court of the United States, is not based on an unreasonable application of clearly established Federal law as determined by the Supreme Court of the United States, and is not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding(s). While Lopez argues that § 2254(d)'s standard of review does not apply, nothing in the record indicates that the Texas Court of Criminal Appeals did not consider and reject all of Lopez' claims on the merits. Moreover, the fact that the state trial judge who presided over Lopez' trial died prior to the Texas Court of Criminal Appeals rejection of Lopez' state application for writ of habeas corpus is of no consequence, as there were no findings or conclusions made by the state trial court, or relied on by the Texas Court of Criminal Appeals in rejecting Lopez' claims. Given the "denial" of Lopez' state application for writ of habeas corpus, Lopez' claims were considered and rejected by the Texas Court of Criminal Appeals on the merits, *see Singleton v. Johnson*, 178 F.3d 381, 384 (5th Cir. 1999) ("In Texas writ jurisprudence, usually a denial of relief rather than a 'dismissal' of the claim by the Court of Criminal Appeals disposes of the merits of a claim"); *Ex parte Torres*, 943 S.W.2d 469, 472 (Tex. Crim. App. 1997) ("In our writ jurisprudence, a 'denial' signifies that we addressed and rejected the merits of a particular claim while a 'dismissal' means that we declined to consider the claim for reasons unrelated to the claim's merit.") and, consequently, § 2254(d)'s standard of review applies herein.

The clearly established Federal Law applicable to claims of ineffective assistance of trial counsel is contained in *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Supreme Court determined that relief is available if a petitioner can show that his counsel was deficient and that the deficiency prejudiced him to the extent that a fair trial could not be had. *Id.* at 687. Deficiency under *Strickland* is judged by an objective reasonableness standard, with great deference given to counsel and a presumption that the disputed conduct is reasonable. *Id.* at 687-689. The prejudice element requires a petitioner to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A petitioner has the burden to prove both the deficiency and the prejudice prongs in order to be entitled to relief. *United States v. Chavez*, 193 F.3d 375, 378 (5th Cir. 1999).

Under *Strickland*, judicial scrutiny of counsel's performance is highly deferential and a strong presumption is made that "trial counsel rendered adequate assistance and that the challenged conduct was the product of reasoned trial strategy." *Wilkerson v. Collins*, 950 F.2d 1054, 1065 (5th Cir. 1992) (citing *Strickland*), *cert. denied*, 509 U.S. 921 (1993). In order to overcome the presumption of competency, a petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland*, 466 U.S. at 690. Under the prejudice prong of *Strickland*, a petitioner must be able to establish that absent his counsel's deficient performance the result of his trial would have been different, "and that counsel's errors were so serious that they rendered the proceedings unfair or the result unreliable." *Chavez*, 193 F.3d at 378; *Cullen*, 131 S.Ct. at 1403 ("[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result") (quoting *Strickland*, 466 U.S. at 686)).

12

"An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691.

Constitutionally effective assistance of counsel under *Strickland* is not errorless counsel. The determination whether counsel has rendered reasonably effective assistance turns on the totality of facts in the entire record. Each case is judged in the light of the number, nature, and seriousness of the charges against a defendant, the strength of the case against him, and the strength and complexity of his possible defense. *Baldwin v. Maggio*, 704 F.2d 1325, 1329 (5th Cir. 1983), *cert. denied*, 467 U.S. 1220 (1984). The reasonableness of the challenged conduct is determined by viewing the circumstances at the time of that conduct. *Strickland*, 466 U.S. at 690-691. Counsel will not be judged ineffective only by hindsight. "The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." *Yarborough v. Gentry*, 540 U.S. 1, 124 S.Ct. 1, 6 (2003).

When an ineffective assistance of counsel claim has been adjudicated on the merits by the state courts, federal habeas review is "doubly deferential," with the court taking a "highly deferential look at counsel's performance" under *Strickland*, and then imposing a second layer of deference under § 2254(d). *Cullen*, 131 S.Ct. at 1403. Under § 2254(d), therefore, the question is not whether counsel's actions were reasonable," but "whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Richter*, 131 S.Ct. at 788. As for *Strickland's* prejudice prong, "the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently." *Richter*, 131 S.Ct. at 791. Instead, the question is whether "fairminded jurists could

disagree that the state court's decision conflicts with [the Supreme Court's] precedents. *Id.* at 786. If "'fairminded jurists could disagree' on the correctness of the state court's decision," § 2254(d)(1) precludes relief. *Id.* at 786. In contrast, where there is no "possibility that fairminded jurists could disagree" and fairminded jurists would uniformly conclude that the state court's decision is contrary to, or based on an unreasonable application of clearly established Federal law, relief is available under § 2254(d)(1). *Id.*

The Texas Court of Criminal Appeals' rejection of Lopez' complaints about counsel's performance vis-a-vis Martha Sisco's and Yamileth Reyes' identification of him at trial and from a photospread is not contrary to or based on an unreasonable application of *Strickland*. The record shows that Yamileth Reyes made an unequivocal identification of Lopez from an investigatory photospread, and then unequivocally identified him at trial. Reporter's Record, Vol. 4 of 8 at 8-10, 25-26 (Document No. 12-14 at 13-14, 29-30). As for Martha Sisco, her trial testimony reveals that she was not "certain" of her identification of Lopez from the photospread. She was, however, certain of her in-court identification. Sisco testified on direct examination in this regard as follows:

> Q:     And, Ms. Sisco, do you recall telling us about a man in a white t-shirt who had a gun in the waistband of his pants?
>
> A:     Yes.
>
> Q:     And you had just told us that you saw the man get up from the table and go over to where the victim was?
>
> A:     Yes.
>
> Q:     And then you told us that an argument started?
>
> A:     Yes.
>
> Q:     Do you see the man in the courtroom who was wearing the white t-shirt, the chubby bald man that was wearing the white t-shirt with the gun in his pants?

A:      Yes.

Q:      And can you point him out for us, please?

A:      Him.

Q:      Can you tell us what he's wearing so we'll know who you are talking about?

A:      He had a white t-shirt.

Q:      What is he wearing today?

A:      A shirt with long sleeves.

The Prosecutor:   Your Honor, may the record reflect the witness has identified the defendant?

The Court:       The record will so reflect.

Reporter's Record, Vol. 3 of 8 at 65-66 (Document No. 12-12 at 68-69).  She then testified on cross-examination about both her in-court and out-of-court identification of Lopez:

Q:      Can you tell the jury when it was that you went down to talk to the detectives or the officers involved?

A:      After the fact?

Q:      Yes.  The same day or the following day or a couple of days later?

A:      Right at the same moment.

Q:      Okay.  Did they eventually show you a photospread of a bunch of pictures?

A:      Yes.

Q:      When was that?

A:      I don't recall the date.

Q:      And how many pictures did they show you?

A:      I don't recall.

Q:      Did you identify anybody from the photos they showed you?

A:      No.

Q:      You did not?

A:      No.

Q:      Did someone show you a picture of my client before you testified today?

A:      Yes.

Q:      Where was that?

A:      When they took some pictures to show them to us, but - -

Q:      Isn't it true you weren't able to identify my client at that time?

A:      Yes.  I did not want to identify him because I was not - -

Q:      My question was:  Isn't it true you were not able to identify him?

A:      I did not want to identify him because - -

        Defense counsel:  Judge, that's not being responsive to my question.

        Prosecutor: Your Honor, may the witness answer the question?

        The Court:  Ma'am, just answer the question "yes" or "no."  I believe it was: You were not able to identify the defendant; is that correct?

A:      Okay.

Q:      [by defense counsel] The question was: Were you able to identify my client, "yes" or "no" ?

A:      No.

Q:      Isn't it true you told the officer the picture they showed you looked like the person who possibly had the pistol?

A:      Yes.

Q:      You weren't sure, but it just looked like him?

A:      Yes.

Reporter's Record, Vol. 3 of 8 at 115-117 (Document No. 12-13 at 17-19).  On re-direct, Sisco

explained her out-of-court identification of Lopez as follows:

Q:      Just to clarify the matter about the pictures.  I'm showing you State's Exhibit
62.  Have you ever seen that group of pictures, that photospread?

A:      Yes.

Q:      Who showed you that photospread?

A:      The police.

Q:      One of the police officers, right?

A:      Yes.

Q:      And when he showed you this photospread, what did you tell him?

A:      That number two looked alike and that I was not sure, but if I saw him
personally, it would be different.

Q:      So, when he showed you this picture, you told him that number two looked
like the person with the gun, right?

A:      Yes.

Q:      But you would rather see him in person so you could say for sure, right?

A:      Yes.

Q:      Okay.  And you saw him in person today in this courtroom, didn't you?

A:      Yes.

Q:      And when you saw him today in this courtroom, are you sure that's the person
you saw with the gun that night?

A:      Yes.

*Id.* at 120-121 (Document No. 12-13 at 22-23).  Then, on re-cross, Lopez' counsel again asked Sisco

about her identification of Lopez:

> Q:      Did they talk to you during the break about this identification question?
>
> A:      What do you mean?
>
> Q:      During our last break, did someone talk to you about this photospread?
>
> A:      Yes.

*Id.* at 121 (Document No. 12-13 at 23).

Given that Stafford *did* challenge Sisco's in-court identification and did point out that her out-of- court identification was equivocal, and given that Lopez did not challenge at trial, and does not dispute herein that he was the person who fired the shots that killed both complainants, Lopez has not shown that Stafford's performance vis-a-vis the identification of him was deficient or that it prejudiced him within the meaning of *Strickland*.[1]  Consequently, under § 2254(d), no relief is available to Lopez on the merits of this ineffectiveness claim.

As for Stafford's performance in connection with the trial court's exclusion of the toxicology reports, the autopsy photos, and Lopez's belief or perception about the meaning of a teardrop tattoo, the record shows that Stafford argued for the admission of that evidence.  With respect to the toxicology reports, Stafford argued for their admission to show that the complainants had cocaine,

---

[1] In the Traverse he filed, Lopez essentially acknowledged the absence of any prejudice associated with Sisco's identification of him:

> Though the coaching did occur, and no identification was possible without the ethics violation of the prosecutor, *Lopez considers the violation as having no impact on the verdict or sentencing.*  Petitioner has never denied being present, and never denied firing the shots that killed the complainants.  He testified to these facts, but maintains that his actions in response were in response to the aggression of Rudy Villanueva and his reasonable apprehension of danger justifying use of deadly force in his own defense.

Traverse (Document No. 28-1) at 7 (emphasis added).

heroin and alcohol in their system, and to suggest that their intoxication made them aggressive and combative.  The trial court, after having heard from the forensic pathologist, who testified that it was impossible to say what effect those drugs and alcohol had on the complainants' behavior, disallowed the toxicology reports as being more prejudicial than probative.  Reporter's Record, Vol. 6 of 8 at 175 (Document No. 12-21 at 61) ("Based on the evidence that I've heard, it looks to me like it would be highly prejudicial.  And any probative value would be only speculative.").  With respect to the autopsy photos of Villanueva, Stafford argued for their admission as part of the autopsy, and "to aid the jury to know the condition of the body and what Mr. Villanueva looked like and what kind of person he was, to show - - so the jury could have a complete understanding under Article 38.18 of the Code of Criminal Procedure, so they can appreciate everything."  Reporter's Record, Vol. 5 of 8 at 264-265 (Document No. 12-18 at 119-120).  The trial court determined that the  photos were not sufficiently relevant to outweigh their prejudicial effect.  *Id.* at 265 (Document No. 12-18 at 120).  As for the teardrop tattoo, Stafford argued to the trial court that Lopez should be able to testify that Villanueva's tattoo "represents some group that he was in – killed somebody and that made him fearful of him."  Reporter's Record, Vol. 6 of 8 at 112 (Document No. 12-20 at 114).  The trial court did allow Lopez to testify that the tattoo made him fearful, but disallowed Lopez from testifying that the tattoo meant that Villanueva had killed someone.  *Id.* at 113 (Document No. 12-20 at 115).

While Lopez argues that Stafford was ineffective because he should have also argued for the admission of that evidence under on TEX. R. EVID. 106 (Remainder of or Related Writings or Recorded Statements) and TEX. R. EVID. 107 (Rule of Optional Completeness), as well as Lopez' right to present a "complete defense," Lopez did not show in the state habeas proceeding, and has not shown herein, that any additional effort or argument by Stafford for the admission of the

evidence and testimony would have been successful *and* that the admission of the evidence and testimony would have changed the outcome of the case.  In addition to the evidence outlined by the Texas Court of Appeals in affirming Lopez' conviction, the record shows that two witnesses, Lisa Hinojosa and Jimmy Lopez testified that Lopez reached around Jimmy and shot Villanueva when he was incapacitated on the ground, and that he shot Pena multiple times while fleeing from the scene when she was injured and also on the ground.  There was also testimony from Jimmy Lopez that Lopez admitted killing Pena because he did not want to leave a witness, Reporter's Record, Vol 5 of 8 at 166, 192 (Document No. 12-18 at 20, 46), and that Lopez had considered fabricating a defense based on an attempted robbery by the complainants.  Reporter's Record, Vol. 5 of 8 at 161 (Document No. 12-18 at 15).  This testimony severely undermined Lopez' claim of self-defense. Also detrimental to the defense was the conflicting and inconsistent version of the events related by Erica Diaz (who testified for the defense) and the incredible version of the events testified to by Lopez himself.  In light of the strength of the evidence against Lopez and the evidentiary weakness of the self-defense theory irrespective of the evidence the trial court excluded, the Texas Court of Criminal Appeals could have reasonably concluded that there was is no reasonable likelihood that the result of the trial would have been different if Stafford had further pursued and secured the admission of the toxicology reports, the additional autopsy photos, and Lopez' testimony about Villanueva's teardrop tattoo.[2]  As such, upon this record, the Texas Court of Criminal Appeals' rejection of these ineffectiveness claims (claims 3 and 5) was not contrary to *Strickland*, was not based on an unreasonable application of *Strickland*, and was not based on an unreasonable

---

[2] Such a conclusion is supported by the Texas Court of Appeals' determination that the trial court's exclusion of the toxicology reports was harmless.  *Lopez v. State*, No. 01-06-01079-CR at 35-37.

determination of the facts.  No relief is available on those claims under § 2254(d).

As for Stafford's performance related to the opinion of Officer Duncan and the absence of a defense expert who could have bolstered the self-defense theory with opinions about the use of a chain and lock as a deadly weapon, the volatility and danger of intoxicated individuals, and the meaning of a teardrop tattoo, again Lopez has not shown that Stafford's performance was defective or that it affected the outcome of the trial.  The record shows that Officer Duncan testified on cross examination about the use of a chain and lock as a potential deadly weapon as follows:

> Q:      And as far as the chain is concerned, true this is not probably a textbook deadly weapon (indicating)?
>
> A:      Correct.
>
> Q:      If you had never seen this chain or this lock before, in the middle of the night, and being 19, 20 years old, somebody starts coming swinging at you, you're probably going to be scared, aren't you?
>
> A:      Scared?  I can see that.
>
> Q:      That's right.
>
>       And if somebody whops you upside the head right here in the temple area, you could be down for the count, couldn't you?
>
> A:      If it was just in such a way, it could be.
>
> Q:      Right.  If I hit you across the bridge of the nose – I wish there was something I could hit, but I'd get in trouble with the Judge.  But, I mean, if I hit you on the bridge of the nose, that would probably fracture the nose, wouldn't it?
>
> A:      It's going to sting a little.
>
> Q:      It's going to sting a little.
>
>       And who knows whether it's going to cause serious bodily injury?
>
> A:      Oh, serious bodily injury, it's possible.

Q:    That meets the definition of – serious bodily injury is something you don't want to sustain, is it?

A:    In an extreme circumstance, it could happen.

Q:    You have the right to defend yourself against serious bodily injury, don't you, if it was justified?

A:    If it was justified.

Reporter's Record, Vol. 4 of 8 at 113-114 (Document No. 12-15 at 11-12).  Lopez did not articulate in the state habeas proceeding and has not articulated herein what objection Stafford could have made that *would have been sustained*.  In addition, and similarly, Lopez did not identify in the state habeas proceeding and has not identified herein any expert witness who could have been retained by Stafford and who would have testified in the manner suggested by Lopez.  Upon this record, therefore, the Texas Court of Criminal Appeals' rejection of these ineffectiveness claims (claims 2 and 4) is not contrary to *Strickland*, was not based on an unreasonable application of *Strickland*, and is not based on an unreasonable determination of the facts.

In all, having considered Lopez' claims in the context of the entire trial record, the very strong evidence of Lopez' guilt, and the inconsistent and, at times, incredible testimony from Lopez and his witness on the issue of self-defense, the undersigned concludes fairminded jurists would not disagree with the Texas Court of Criminal Appeals' rejection of Lopez' ineffective assistance of counsel claims.  As such, under § 2254(d), no relief is available on any of those claims.

## VI.    <u>Discussion</u> – Due Process Claim

In his last claim, Lopez contends that his due process right to a fair trial was infringed when the prosecutor made the following statements during closing arguments:

So, the only other question, and what this whole charge boils down to is: Do you believe that this happened in self-defense?  And that's what you need to spend your time talking about.  And I submit to you it is not going to be a hard discussion if you listen to the facts and the testimony out of the defendant's own mouth.

Now, the defense wants you to look at each individual shooting in isolation, but that's not what the charge tells you to do.  The charge tells you . . . in determining the existence of real or apparent danger, in order to see if it is a self-defense case, you can consider all the facts and circumstances in this case.  When you are determining whether self-defense exists, you consider all of the facts and circumstances.

You have a lot of evidence in front of you.  Don't try to put some in box B and some in box A.  The law doesn't require you to do that.  You can look at what he did to Modesta Pena, and I think it's pretty clear the defense is conceding that her death is not justified by self-defense no matter what kind of crazy story he told you on the witness stand, because they know that that fell flat on its face and didn't sell.  So, they have conceded that Modesta Pena was not killed in self-defense.

So, the only way you can find him guilty of murder instead of capital murder is to believe that Rudy Villanueva was killed in self-defense.  *Well, there are a ton of reasons why that's not the case.  And I will try to think of as many as I can, but y'all are going to have your own list back there yourselves.  But one of the things you can look at is you can look at how coldly and calculatedly he killed Modesta.  And that will instruct you on the truth of his version of events with regard to Rudy.*

Reporter's Record, Vo9l. 6 of 8 at 195-196 (Document No. 12-21 at 81-82) (emphasis added to complained of argument/statements by the prosecutor).  According to Lopez, those statements were a misstatement of the law as contained in the jury charge.

A claim of prosecutorial misconduct that is based on improper argument, statements or questioning of witnesses will generally not provide "a ground for relief unless it casts serious doubt upon the correctness of the jury's verdict."  *Styron v. Johnson*, 262 F.3d 438, 449 (5th Cir. 2001), *cert. denied*, 534 U.S. 1163 (2002).  "Only where improper prosecutorial comments substantially affect the defendant's right to a fair trial do they require reversal."  *Id.*  Three factors are considered in determining whether prosecutorial misconduct rises to the level of a due process violation: "1) the magnitude of the prejudicial effect of the remarks; 2) the efficacy of any cautionary instruction given

by the judge; and 3) the strength of the evidence supporting the conviction." *Id.* Where the improper prosecutorial statement, argument, or line of questioning is not so pronounced and persistent when viewed in the context of the entire trial, no relief is available on such a claim of prosecutorial misconduct. *Bradford v. Whitley*, 953 F.2d 1008, 1013 (5th Cir.), *cert. denied*, 506 U.S. 829 (1992).

Here, the record shows that Lopez' counsel objected to the complained of statements by the prosecutor during closing arguments, and the trial court instructed the jury that the prosecutor's statements were argument and that the law was in the court's charge to the jury. Reporter's Record, Vol. 6 of 8 at 196-197 (Document No. 12-21 at 82-83). The record also shows that Lopez complained on appeal about these same statements by the prosecutor during closing arguments, and that the Texas Court of Appeals found that the prosecutor's statements were permissible jury argument under Texas law. *Lopez v. State*, No. 01-06-01079-CR at 44-49.

Based on the record, the trial court's instruction to the jury that the prosecutor's statements were argument and not the law, and the Texas Court of Appeals' determination that the prosecutor's statements were permissible jury argument that did not misstate the law of self-defense, it cannot be said that the Texas Court of Criminal Appeals' rejection of this due process claim is contrary to or based on an unreasonable application of clearly established Federal law. Consequently, under § 2254(d), no relief is available on this claim.

## VII.   **Conclusion and Recommendation**

Based on the foregoing and the conclusion that no relief is available to Lopez on the merits of any of his claims under § 2254(d), the Magistrate Judge

RECOMMENDS that Respondent's Motion for Summary Judgment (Document No. 20) be

GRANTED, and that Petitioner Jesse Lopez, Jr.'s Federal Application for Writ of Habeas Corpus (Document No. 1) be DENIED and DISMISSED WITH PREJUDICE.

The Clerk shall file this instrument and provide a copy to all counsel and unrepresented parties of record.  Within fourteen (14) days after being served with a copy, any party may file written objections pursuant to 28 U.S.C. § 636(b)(1)(C), FED. R. CIV. P. 72(b), and General Order 80-5, S.D. Texas.  Failure to file objections within such period shall bar an aggrieved party from attacking factual findings on appeal.  *Thomas v. Arn*, 474 U.S. 140, 144-145 (1985); *Ware v. King*, 694 F.2d 89, 91 (5th Cir. 1982), *cert. denied*, 461 U.S. 930 (1983); *Nettles v. Wainwright*, 677 F.2d 404, 408 (5th Cir. 1982) (en banc).  Moreover, absent plain error, failure to file objections within the fourteen day period bars an aggrieved party from attacking conclusions of law on appeal. *Douglass v. United Services Automobile Association,* 79 F.3d 1415, 1429 (5th Cir. 1996).  The original of any written objections shall be filed with the United States District Clerk.

Signed at Houston, Texas, this 22nd day of January, 2016.

Frances H. Stacy
United States Magistrate Judge